HARDIN, P. J., and MARTIN, J., concurred.

Judgment affirmed, with costs.

In the Matter of the Application for a Voluntary Dissolution of EUREKA MOWER COMPANY.

THE STANDARD HARROW COMPANY, Appellant; ADOLPHUS I. SIMMONS, Receiver, etc., of EUREKA MOWER COMPANY, Respondent.

*Fixtures, how determined — intent and conduct of the parties — effect of the enumeration of certain of the articles in a conveyance.*

Ordinarily, in determining whether a certain article is a fixture and a part of the realty, the purpose of the annexation and the intent with which it was made are the most important considerations. The intent is sometimes presumed or it may be inferred from circumstances.

When, however, there is an agreement on the subject between the parties, then the intent of the parties is to be given effect, and the question becomes one of interpretation and construction, determinable by the general rules applicable in such cases. In such cases the conduct of the parties is material, and if the language of the contract is indefinite or ambiguous, the practical interpretation of it by both parties is a consideration of importance.

If there be many things of the same class or kind, the expression of one or more than one thing in a conveyance implies the exclusion of all not expressed, although the law would have included all if none had been enumerated.

What specific articles are or are not fixtures which become part of the freehold, considered.

APPEAL by The Standard Harrow Company from an order of the Supreme Court, made at the Onondaga Special Term and entered in the office of the clerk of the county of Oneida on the 8th day of January, 1895, adjudging certain property to be personal property, to the possession of which the receiver of the Eureka Mower Company is entitled.

*Risley, Robinson & Love,* for the appellant.

*Cookingham & Sherman,* for the respondent.

MERWIN, J.:

In February, 1893, the respondent Simmons was appointed receiver of the Eureka Mower Company, a domestic corporation organized for the purpose of manufacturing and selling mowing machines and other agricultural tools. At this time the company was in possession of about seven acres of land, on which were located brick buildings built by the company in which to conduct its business, and it had there manufactured mowing machines and also spring tooth harrows and cultivators. The receiver, after his appointment, continued to some extent to carry on the business for the purpose of closing up the affairs of the company. On the 6th of September, 1893, by authority of the court, the receiver entered into a written contract with Edwin H. Risley, leasing to him for one year the real estate and certain machinery, and giving him the right to purchase the same on certain terms, provided he gave notice in writing on or before July 1, 1894, of his desire and determination to do so. This option of purchase was in due time accepted by the Standard Harrow Company, the assignee of Risley, and for whose benefit, apparently, Mr. Risley acted in the transaction. In carrying out this contract a controversy arose as to whether certain articles on the premises were real estate and so passed under the contract, or whether they were personal property, and not included in the contract of sale. Thereupon the parties agreed upon a statement of the facts, and the receiver, upon notice, applied to the court for instructions, and for a determination of the questions involved, each party stipulating to abide by the decision of the court, without prejudice to the right of appeal. After hearing both parties the order appealed from was made.

In the contract of September 6, 1893, the property leased is described as follows: "The manufacturing plant known as the Eureka Mower Company's property, consisting of about seven (7) acres of land, on which are erected an office building, foundry, machine shops, storehouse, lumber sheds, scales, and other appliances for conducting a manufacturing business, including only such machinery and office furniture as is mentioned in a schedule hereunto attached marked 'A,' with all the appurtenances, rights, privileges and benefits, railroad tracks, water rights, and other privileges incident to said real estate."

In giving the option of purchase, the property is described as "the property embraced in this lease." In Schedule "A," annexed to the contract, there was first, under the head of "office furniture," a list of such articles, then, under the head of "machinery, etc., in wood shop," a number of articles were specified, including "one grindstone with iron frame," several circular saws and tables, a planer, a lathe, a section fan and its air pipes, work benches and iron vises on them, and "all countershafts and belts now used for driving all the foregoing machinery." Then, under the head of "machinery and tools in blacksmith shop" several articles were named, among others "one Merrill & Bros. drop hammer," a spring hammer, all countershafts and belts used for driving them, "one fan blower with its countershaft, belting and air pipes," and lastly, under the head of "machinery, piping, shafting, etc.," there was entered "all piping, line shafting and line belting, boilers, engines, heaters, steam pumps, all tools and appliances in the engine and boiler rooms."

On the same day that this contract was made, the receiver took back from Risley a lease for a year of "all that part of the Eureka Mower Company plant in Utica, described as follows: The north one-half of the machine shop and the rooms known as the milling, grinding and chipping rooms, on the north front of said plant, the foundry, sand house and pattern house, the cupola house, core room, and the iron and coke sheds, the easterly lumber shed," and a certain portion of the office and furniture therein. On the 2d of January, 1894, the receiver gave to Hart & Crouse a lease from January 1 to September 1, 1894, of "all that part of the Eureka Mower Company plant in Utica, New York, which is described as follows: The entire foundry, the sand house, pattern house, core room, cupola house, coal and coke houses, the milling and grinding rooms, and all the machinery therein," excepting certain things not important here. Prior to June 23, 1894, Risley assigned to the Standard Harrow Company the contract and option of September 6, 1893, and that company also acquired of Hart & Crouse their lease for the months of July and August, 1894, and entered into possession thereunder.

The articles in controversy are a cupola, a blower, seven tumbling barrels, two grindstones, a power press, a drop hammer, two pattern-

makers' work benches, one having an iron vise and the other a wooden vise, and a quantity of hose and couplings. It is not claimed that any of these articles are mentioned in Schedule A attached to the contract of September 6, 1893. That contract by its terms included "only such machinery" as was mentioned in the schedule. So that if the articles in question are to be deemed machinery within the contemplation of the parties, they did not pass. The appellant claims they were so attached or used that they formed part of the realty and were not affected by the provision in the contract as to machinery.

Ordinarily in determining whether a certain article is a fixture and a part of the realty, the purpose of the annexation and the intent with which it was made are the most important considerations. (*McRea* v. *Central Nat. Bank of Troy*, 66 N. Y. 489.) The intent is sometimes presumed (*Tifft* v. *Horton*, 53 N. Y. 382; Ewell on Fixtures, 43) or it may be inferred from circumstances. (*McRea* v. *Central Nat. Bank, supra; Voorhees* v. *McGinnis*, 48 N. Y. 278.) So that, in the present case, although the intent with which the annexations were made is not specifically stated in the facts agreed upon, still the object and purpose of the annexation appear from the surrounding circumstances, and these facts are to be considered in ascertaining the intent of the annexation so far as it may be material. When, however, there is an agreement on the subject between the parties, then the intent of the parties is to be given effect and the question becomes one of interpretation and construction, determinable by the general rules applicable to such cases. (Ewell on Fixtures, 307.) In such cases the conduct of the parties is material, and if the language of the contract is indefinite or ambiguous the practical interpretation of it by both parties is a consideration of importance. (*Woolsey* v. *Funke*, 121 N. Y. 92.)

It is conceded that most if not all of the articles in controversy were placed in the buildings by the Eureka Company for its use in its manufacturing business. It is also quite apparent that many articles so placed were by all parties without question considered personal property.

Of the articles in question, the cupola, the blower and the tumbling barrels were used in connection with the foundry. The cupola was in the foundry building and was used for melting iron

to be used in making castings. It rested on a concrete foundation let into the ground and extended upward through the floor and through the roof and was covered with iron. It consisted of an iron shell about fifty-six inches in diameter, lined on the inside with fire brick, and was supported in its vertical position by iron stops bolted to the floor and to the roof. The structure seems to have been called the cupola house in the sublease to the receiver. The blower in question was used in connection with the cupola and was necessary to its operation. It was located on the second floor of the building to which it was firmly attached by bolts, and it was connected with the interior of the cupola by a metallic pipe. Motion was imparted to the blower through a system of shafts, pulleys and belts which connected with the main line of shafting in the building. The countershafting was supported by hangers bolted to timbers connected with the frame work or works of the building. The Standard Harrow Company upon taking possession under the lease assigned to it by Hart & Crouse severed the blower from all connection with the building cupola, and at the termination of the lease the blower together with its countershaft, pulleys, hangers and bolts lay on the floor in the foundry building.

Tumbling barrels are used in all iron casting foundries to free the castings from sand and other roughness of surface. The barrel is mounted on shafts supported in bearings made of cast iron which in turn are supported on a concrete foundation, the bearings being held in position by bolts, the heads of which are built into the concrete foundation and the bolts pass through the base of the bearings and are held in position by nuts. On one end of the bearings is a large cast iron pulley from which a belt runs to a countershaft, and this by belt is connected with the main line of shafting. One of the barrels in question was in the same room with the cupola and the others were in a tumbling barrel room and were to some extent separated by wooden partitions. They were all supported in a similar way and were driven by belts running to countershafting, and that in turn receiving power through belts from the main line.

The two grindstones were located in the room adjoining that containing the tumbling barrels. The grindstone beds or walls were built of brick and mortar and let into the ground and on the top of the

walls there were bolted two timbers, one on each wall, and on these timbers the hangers for supporting the grindstone shafts were bolted. On the end of each grindstone shaft was a large cast iron pulley connected by belt with the countershafting and that by belt connected with the main line. On the 16th of January, 1894, the receiver sold at public sale a large amount of property located in the said buildings, including the said grindstones, with the belts, pulleys, countershafts and hangers therefor, and Risley and the manager of the harrow company were present and saw the same sold and made no objection thereto or any claim on the property.

The power press and the drop hammer were in the machine shop. The press rested upon a large flat stone placed on a concrete foundation about four feet square let into the ground a sufficient depth to support and steady the press in its work, the press being held in position by its own weight. The drop hammer was placed on a block of wood set in a vertical position and let into the ground a number of feet. The base of the hammer was bolted to the block by bolts so as to be held firmly in position. Both the press and the hammer were connected by pulleys and belts with the countershafting, and were operated by power derived in that way. They were located in that part of the building occupied by Risley and the harrow company, and on the 4th of October, 1893, the harrow company rented them of the receiver for several months.

The work benches and vises were for the use of patternmakers, and were in no way fastened to the buildings. During the term of the lease they were removed by the harrow company from the room they were in at the time of the lease to another. The hose was at the date of the lease distributed in different rooms, and was fitted to be attached to hydrants in the yard of the mower company, for use in case of fire, and for any other purpose which it was suited for. It was provided for the safety of the plant, and the couplings were arranged to connect with the couplings of the hydrants. Neither the hose or the couplings were special, but were such as were in general use.

It is evident that all the articles in controversy, except the cupola, that were attached to the buildings or grounds, could be removed without injury, so that each of such articles may be said to be in itself a complete machine, or a complete article of machinery

capable of being used in other places of like character.    It is to be observed that in the schedule of machinery attached to the contract there are specified a fan blower and belting, and a drop hammer. The failure to specify the similar articles in controversy would indicate an intention they should not be included.    All line shafting and line belting are specified, but only the countershafts and belts then used for driving the machinery therein specified.    The infer- ence would be that the countershafting and belting, in connection with articles not specified, were not intended to be included, as all the countershafting was attached to the buildings in substantially the same form.    The conduct of the parties in regard to the sale of the grindstones and the renting of the power press and drop hammer, although the latter was at the time in possession of Risley and the harrow company, is suggestive of an understanding at the time that they were not covered by the original contract.    The purpose of the lease in the contract of September 6,.1893, was to enable the lessee or the harrow company to manufacture harrows.    For that purpose they had no use for the articles specially connected with the foundry, and so it may be said that for that reason they were not mentioned in the schedule of machinery or intended to be included in the contract of purchase.    The tumbling barrels were such as were used in similar foundries, and if the countershafts used in connec- tion with them were not intended to be covered by the contract, as they were not therein specified, it may also be said that the barrels were not intended to be covered.    They were certainly no more a part of the realty than the line shafting, and the specification of the latter gives point to the failure to specify the other.

If there be many things of the same class or kind, the expression of one or more of them in a conveyance implies the exclusion of all not expressed, although the law would have implied all if none had been enumerated.    (2 Pars. on Cont. [8th ed.] 516 ; *Hare* v. *Horton*, 5 B. & Ad. 715.)

The foregoing considerations lead to the conclusion that the cupola should be deemed to be a part of the realty, but that all the other articles in controversy should be deemed machinery within the contemplation of the parties, and not being specified in the schedule attached to the contract, were not intended to be covered by its provisions.

The order appealed from should, therefore, be modified by declaring that the cupola is a part of the realty ; in other respects the order should be affirmed.

HARDIN, P. J., and MARTIN, J., concurred.

Order modified as stated in the opinion, and as modified affirmed, without costs of appeal to either party.